FILED
United States Court of Appeals
Tenth Circuit

December 20, 2013

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff – Appellee,

v.

TITO ONTIVEROS,

      Defendant – Appellant.

No. 12-1354
(D.C. No. 1:11-CR-00214-PAB-1)
(D. Colo.)

---

ORDER AND JUDGMENT[*]

---

Before **LUCERO**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **PHILLIPS**, Circuit Judge.

---

A jury convicted Appellant Tito Ontiveros on two counts charging firearms violations: first, felon in possession of a firearm under 18 U.S.C. § 922(g)(1); and, second, possession of an unregistered firearm under 26 U.S.C. §§ 5861(d). After finding that Ontiveros qualified as an armed career criminal under 18 U.S.C. § 924(e), the district court sentenced him to 262 months in prison on the first count and a concurrent term of 120 months on the second. On appeal, Ontiveros raises three

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

challenges to his conviction and sentence: (1) that the district court violated his Sixth Amendment right to counsel; (2) that the court erred in denying his motion to suppress the evidence obtained under the search warrant; and (3) that the court imposed upon him a substantively unreasonable sentence. Exercising jurisdiction under 28 U.S.C. § 1291, we reject those challenges and affirm the decisions of the district court.

## I.  Background

### A. The Search Warrant

Tito Ontiveros (a.k.a. "T") lived in the detached garage of a house belonging to his sister and brother-in-law. Based largely on criminal investigations and information provided by witnesses and individuals, law enforcement began to suspect that Ontiveros might be using the garage for various criminal activities—including the sale of stolen property and illegal drugs. This information came from a variety of sources over the course of several months.

As early as 2009, an informant had told police that Ontiveros was selling stolen televisions from his garage. In 2010, law enforcement investigated an unrelated crime, this time a burglary. The main suspect said that he could not have committed the burglary because he had been helping Ontiveros close off his garage door opening when the crime was committed. But Ontiveros was also a friend of the burglary victim. In their continued investigation, officers learned that the suspect had left the stolen property in another woman's control. That woman informed police that

the suspect and "T" or "Tito" had later held her at gunpoint to recover the same stolen property the suspect had previously taken. She claimed "T" and the suspect used methamphetamine during the recovery. Despite allegedly recovering the stolen property, the suspect was later charged with the burglary in state court. The police were unable to substantiate the woman's claims.

In October 2010, the police obtained information from an individual claiming that a man named "T" was selling methamphetamine from a garage containing "lots of guns, including AK 47s." R. vol. 1, at 94. During the same investigation, yet another person told the police that "Tito" was selling methamphetamine. The police determined that the information referred to Ontiveros and his garage.

In January 2011, an officer stopped a car registered to Ontiveros's mother that police knew he drove regularly. Ontiveros was driving. During a consent search of the car, officers found a small bag of suspected methamphetamine and a single round of handgun ammunition. Ontiveros's female passenger told police that Ontiveros had a gun in the car. When officers found no firearm, she surmised that Ontiveros had left the gun at his garage when the two stopped there before the traffic stop. She also informed police that Ontiveros was selling up to a half ounce of methamphetamine per day. Despite this information, Ontiveros was not charged with any offense.

In April 2011, the police collected and searched trash left in bins outside the property where Ontiveros lived. They retrieved what appeared to be a drug note and ledger, two handgun holsters (while knowing that Ontiveros was a felon), and a

- 3 -

suspected explosive device. The suspected drug note—which, according to the affidavit, "appeared to be an ongoing conversation with more than one form of handwriting"—read:

> Did you want like a T-Shirt to work and its only $80.00.
> Yes if you could it would help
> I fucken love you
> Always there
> For us

R. vol. 1, at 95. As stated in the affidavit supporting the search warrant, a "T-Shirt" is slang for a sixteenth ounce of controlled substance—in the affiant's experience, often cocaine or methamphetamine—and "$80.00" is a realistic price for that quantity. The suspected drug ledger read as follows:

> GD
> 120-
> <u>50</u>
> 70+300+150
> 520 as of 3-2-11

*Id.* at 96. However, directly after accurately quoting the drug ledger, the affidavit erroneously stated, "This ledger appeared to be tracking transactions *since* 03-02-11." *Id.* (emphasis added).

The police called the bomb squad to test and dispose of the suspected explosive. The device consisted of a red bamboo tube with an inner cardboard body and a green braided fuse. In disabling it, the bomb squad saw that its contents burned rapidly. The bomb squad commander determined that the device met the statutory definition of an explosive or incendiary device.

Armed with the law enforcement reports dating back to 2009, the fruits of the trash sweep, and Ontiveros's known criminal history, the police sought and obtained from a state magistrate a search warrant for the home and garage. In the garage, in plain view, they found a sawed-off .410 shotgun with a 12.25 inch barrel and an overall length of 18.25 inches. They also found various types and multiple rounds of ammunition for both shotguns and handguns. In addition to the firearm and ammunition, the search uncovered drug paraphernalia and suspected drug residue.

Ontiveros arrived during the search. After an officer read Ontiveros his *Miranda* rights, he admitted he kept the sawed-off shotgun for protection.

Ontiveros, acting through counsel, moved to suppress the evidence obtained under the search warrant based on what he contended were material omissions in the supporting affidavit and its failure to provide facts sufficient to establish probable cause. The district court heard arguments on the motion on January 13, 17, and February 14, 2012. The court denied Ontiveros's motion and found a substantial basis for the state magistrate's probable-cause determination. Alternatively, the court also found the good-faith exception would defeat the suppression motion even if the warrant had failed to establish probable cause.

**B.    Representation by Counsel and Self-Representation**

At Ontiveros's initial appearance, the federal magistrate assigned him his first public defender, Matthew Golla. Just two weeks after Golla's appointment, Ontiveros filed the first of a myriad of motions without Golla's signature and against his advice.

- 5 -

These motions were largely frivolous. For example, Ontiveros moved for an evidentiary hearing, for an evidentiary "meeting," and for the court to take judicial notice of the invalidity of the firearms statute because Congress had supposedly lacked a quorum when it passed the law. Further, Ontiveros filed a motion to obtain his grand jury transcripts, even after Golla had explained the legal futility of the motion. Even though Golla had agreed to request the transcripts, Ontiveros still filed his own motion.

After only two months of representing Ontiveros, Golla moved to withdraw. At the hearing on the motion to withdraw, Golla informed the court that Ontiveros had filed complaints with the Tenth Circuit and the Colorado Bar, accusing him of ineffective representation. Golla explained the difficulties arising out of Ontiveros's insistence that he had a right to a copy of the grand jury transcripts and Ontiveros's accusations that Golla was withholding the transcripts. Golla further informed the court that Ontiveros had refused to speak with Golla's investigator to provide the location of potential witnesses to testify at the upcoming suppression hearing. Golla said he suspected that Ontiveros's complaints came from poor advice received from jailhouse lawyers at the correction facility. Having heard the history of the attorney-client relationship, the court found communications had irreparably broken down, and it granted Golla's motion to withdraw.

Two days later, the court appointed Scott Reisch to represent Ontiveros. Reisch lasted four months before moving to withdraw, explaining that irreconcilable

differences had developed and that Ontiveros wished to proceed pro se. Ontiveros filed a similar motion of his own, seeking Reisch's removal and requesting that he be allowed to represent himself. Not waiting for the district court to decide the motion, Ontiveros continued his practice of regularly filing pro se motions, including a request for bond and for a continuance of his trial.

At the hearing on Reisch's motion to withdraw, the court thoroughly examined the underlying reasons for the disagreements between Reisch and Ontiveros and found no irreconcilable difference between them warranting withdrawal of counsel. Next, the court thoroughly questioned Ontiveros about his insistence that the court allow him to represent himself. Ontiveros explained that "this is a motion basically asking the Court to grant and file -- basically to be pro se and ask for extension of time for pretrial motions and extension of -- push my trial date all the way down to April, if possible." R. vol. 4, at 8. The court cautioned Ontiveros of the pitfalls of self-representation and encouraged him to keep his appointed attorney:

> I mean, I have seen some of your pro se motions and I was looking at the motions you just recently filed, and it goes back to what we were talking about the last time which is Mr. Reisch knows the law. He is a very experienced trial counsel. And I think you understand that. You may have a disagreement as to certain motions, but you probably don't disagree with the fact that Mr. Reisch has a good understanding of the law. You don't. *So as a result, representing yourself poses lots of hurdles to you, a tremendous number of hurdles*.

> So I frankly haven't heard anything that constitutes any type of irreconcilable conflict at this time, but you have got a constitutional right to represent yourself if you really wish to go that route.

> So, you know, I think that the first thing that you probably need to decide is whether or not you wish to carry on with Mr. Reisch. He has indicated he is perfectly willing to go to trial in this case and I know from personal experience he does a very good job. You may have some disagreements, *but that would be I think a distinct advantage to you to have Mr. Reisch represent you at trial . . . .*
>
> So undoubtedly I think you probably have thought about those things, and if you wish, I can give you a little bit more time to think those through, *but deciding to go to trial on your own as a pro se litigant, it's a big, big decision.*

*Id.* at 9–10 (emphasis added). Despite the court's admonitions, Ontiveros continued to insist on representing himself.

While emphatically demanding that the court allow him his constitutional right to self-representation, Ontiveros simultaneously sought to delay his trial until April, supposedly because his family was attempting to procure an out-of-state lawyer to represent him. The court doubted whether this would actually happen given Ontiveros's earlier failures to retain private counsel. Ontiveros nonetheless insisted that his family was gathering the funds to retain counsel:

> But at the time being, I mean, I would like to go as far as [sic] pro se if possible, if the Court allows it. And I apologize to my family, actually, also for putting them in this situation. I mean, like you said and Scott Reisch, I have a constitutional right to go pro se.

*Id.* at 12. Once again, the court advised Ontiveros of the dangers of self-representation, and stated it would "be receptive to having someone come onboard" to represent Ontiveros. *Id.* at 12–13. Rejecting the court's caution, Ontiveros again demanded to proceed pro se. The court asked: "but that then begs the question of whether you should be allowed to represent yourself, in which case if I grant that

request, then Mr. Reisch will not be representing you, obviously. Do you want to do that?" *Id.* at 14–15. Ontiveros replied: "Yes, sir." *Id.* at 15.

The court proceeded to ask Ontiveros the requisite questions to ascertain whether he knowingly and voluntarily waived the right to counsel. In response, Ontiveros assured the court that he wanted to represent himself, that he was familiar with the charges and potential penalties, that he understood the court could not help him, that he was responsible for knowing courtroom rules, and that his decision was voluntary. Finally, after ensuring that Ontiveros fully understood the pitfalls of self-representation and advising against it, the court acceded to Ontiveros's exercise of his constitutional right to self-representation. At the court's request, however, Ontiveros accepted Reisch as "advisory counsel."

During his month of official self-representation before the suppression hearing, Ontiveros continued to file pro se motions right up to the day of the hearing. Among these were motions to dismiss, to order the Assistant U.S. Attorney to respond to his motions and to expedite those responses, to set an evidentiary hearing, and to fire Reisch from his advisory role.

On January 13, 2012, the court held the first of a three-part hearing on the suppression motion drafted by Golla. At this hearing, with no indication he might do so, Ontiveros sought a continuance, claiming to have recently retained private counsel:

> Good morning, Your Honor. Tito Ontiveros, representing myself as pro se. Possible that family finally got the money to get a defense lawyer. If

I can get a continuance? He came to see me Tuesday. He is going to come on board Monday or Tuesday next week; come out and see me.

*Id.* vol. 1, at 495. Ontiveros assured the court that the attorney had agreed to represent him and disclosed that "[h]e was actually my Defense Attorney in the state, through Adams County." *Id.* at 496–97. Taking a recess, the court tried to call the attorney at the number Ontiveros had provided, but the number "just rang busy." *Id.* at 496. Eventually, the court managed to contact this attorney and reported that Ontiveros's claim was incorrect. Returning to the courtroom, the court said: "My judicial assistant just reached [the attorney], and he, in fact, as Mr. Ontiveros said, has represented Mr. Ontiveros in the past. He indicated that he does not represent Mr. Ontiveros and will not be representing Mr. Ontiveros. So we will go forward today." *Id.* at 497.

Ontiveros then claimed he was not prepared to proceed because he had encountered problems accessing the discovery documents supplied by the prosecutor and because Reisch, now acting as advisory counsel, had not visited him and was not present at the start of the hearing. The court responded that Ontiveros's last motion had been to fire Reisch as advisory counsel and that Ontiveros knew Reisch would miss the beginning of the hearing. At that point, Ontiveros asked the court to "assign me an attorney"—evidently seeking a third appointed attorney other than Reisch. *Id.* at 498. The court declined to continue the hearing and did not provide a last-minute appointment of new counsel. The court noted that the prosecution had seven police officers waiting to testify and that Ontiveros had failed to prepare for the hearing

- 10 -

despite his ready access to the discovery material. Nowhere did Ontiveros even hint that he might accept Reisch as appointed counsel. The court proceeded with the suppression hearing.

At no point during the rest of the hearing did Ontiveros again ask for appointed counsel or claim to have retained counsel. However, immediately after losing the suppression motion, and in response to Reisch's private suggestion, Ontiveros requested that the court reappoint Reisch to represent him at trial. Consistent with the court's earlier advice that Ontiveros have counsel rather than represent himself, the court promptly agreed.

## C. Sentencing

Following a trial, the jury convicted Ontiveros of both counts alleged in the indictment. Because Ontiveros qualified as an armed career criminal under 18 U.S.C. § 924(e), his total offense level was 34 and his criminal-history category was VI, resulting in an advisory sentencing guideline range of 262 to 327 months. Ontiveros moved for a downward variance, but the district court denied the motion after considering several of the applicable 18 U.S.C. § 3553(a) sentencing factors. Ultimately, the court sentenced Ontiveros to concurrent terms of 262 months in prison on the first count and 120 on the second count.

Ontiveros now alleges three points of error. First, he argues the district court violated his rights under the Sixth Amendment by (1) accepting an equivocal waiver of his right to counsel, and (2) not appointing him counsel a month after the court

reluctantly had allowed him to proceed pro se. Second, he contends the district court erred in denying the motion to suppress. Third, he challenges the substantive reasonableness of his sentence.

## II.    Discussion

### A. Sixth Amendment Right to Counsel

We review de novo whether a waiver of counsel complies with the Sixth Amendment's requirements. *United States v. Mackovich*, 209 F.3d 1227, 1236 (10th Cir. 2000). In doing so, we review the district court's findings of fact for clear error. *Id.* In evaluating a district court's denial of a post-waiver request for counsel, we review for an abuse of discretion. *United States v. Merchant*, 992 F.2d 1091, 1095 (10th Cir. 1993).

The Sixth Amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy . . . the Assistance of Counsel for his defence." U.S. Const. amend. VI. As a corollary to the right to counsel, the Sixth Amendment also protects a defendant's right to conduct his own defense. *Faretta v. California*, 422 U.S. 806, 834 (1975). To exercise the right to self-representation, a defendant must clearly and unequivocally assert the intention to proceed pro se, the assertion must be timely, and the assertion must be knowing and intelligent to relinquish the benefits of counsel. *Mackovich*, 209 F.3d at 1236. Ontiveros argues that the district court violated his Sixth Amendment right by accepting his equivocal waiver of the right to counsel.

Requiring a clear and unequivocal waiver protects a defendant from unintentionally relinquishing counsel. *Id.* But an unequivocal waiver "also prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation." *Id.* (internal quotations omitted). The defendant may not delay the proceedings by placing the judge "in a position where, in moving along with the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel." *United States v. Allen*, 895 F.2d 1577, 1578 (10th Cir. 1990) (internal quotations omitted).

Ontiveros first contends that the district court violated his Sixth Amendment right to counsel by accepting an equivocal waiver of that right. He argues that his request did not amount to an unequivocal waiver of his right to counsel because he had told the court that he might later retain counsel.[1] We reject this argument. Ontiveros presents no authority that a waiver of counsel is equivocal if the person waiving suggests that he may later choose to hire counsel. In our view, any such rule would impinge greatly on the right of self-representation.

---

[1] Ontiveros also claims the trial court de facto committed reversible error by denying him counsel at a "critical stage" of the criminal proceedings—the suppression hearing. *See Kansas v. Ventris*, 556 U.S. 886, 890 (2009) ("We have held, however, that the [6th Amendment] right extends to having counsel present at various pretrial critical interactions between the defendant and the State . . . ." (internal quotations omitted)). But because we hold that Ontiveros validly waived his right to counsel and that the district court did not abuse its discretion in denying the post-waiver reappointment, Ontiveros was never denied the right to counsel. Therefore, this argument also fails.

Moreover, Ontiveros repeatedly expressed the clear and unequivocal nature of his waiver at the combined hearing on Reisch's motion to withdraw and Ontiveros's own motion to proceed pro se. The court expressed its willingness to give Ontiveros a reasonable amount of time to hire a new lawyer to prevent a gap in representation. In response to the court's effort to delay his decision to proceed pro se, Ontiveros replied:

> But at the time being, I mean, *I would like to go as far as [sic] pro se if possible*, if the Court allows it. And I apologize to my family, actually, also for putting them in this situation. I mean, like you said and Scott Reisch, *I have a constitutional right to go pro se*.

R. vol. 4, at 12 (emphasis added). Thereafter, the district court questioned Ontiveros's desire to fire Reisch. Again, Ontiveros repeated his preference to represent himself.

Rather than simply accepting Ontiveros's demand that he be allowed to represent himself, the district court thoroughly conversed with Ontiveros about the perils of this approach and cautioned him against it. *See United States v. Reddeck*, 22 F.3d 1504, 1510 (10th Cir. 1994) ("Ideally, the trial judge should conduct a thorough and comprehensive formal inquiry of the defendant on the record to demonstrate that the defendant is aware . . . and is fully informed of the risks of proceeding *pro se*." (internal quotations omitted)). In response, Ontiveros expressed a knowing and voluntary decision to represent himself. Out of an abundance of caution, the district court concluded by again asking, "Mr. Ontiveros, just to confirm, do you wish to

- 14 -

proceed to represent yourself in this matter?" R. vol. 3, at 69. Ontiveros responded: "Yes, I do, Your Honor." *Id.*

In sum, even though Ontiveros may have intended to try to retain counsel later, he still clearly and unequivocally waived his right to counsel and invoked his right to self-representation.[2] Despite the district court's best efforts to persuade Ontiveros to continue with appointed counsel, Ontiveros insisted on representing himself. His Sixth Amendment right to do so cannot be voided by a thought that he might later choose to hire counsel. Ontiveros cites no authority suggesting that a court could condition self-representation upon a defendant's foreswearing later hiring counsel.

Next, Ontiveros argues the district court violated his Sixth Amendment right to counsel by denying his post-waiver request for reappointment of counsel. After waiving the right to counsel and proceeding pro se, a defendant has no absolute right to revoke that waiver and demand another round of appointed counsel. *Merchant*, 992 F.2d at 1095. Even so, an initial decision to proceed pro se does not automatically bind a defendant to self-representation for the entirety of the remaining proceedings. *See Menefield v. Borg*, 881 F.2d 696, 700 (9th Cir. 1989) ("We are certainly unwilling to deny counsel because of some conception that the defendant's initial

[2]     Ontiveros also argues that his subsequent request for reappointed counsel introduces doubt as to whether the request to represent himself was unequivocal. Ontiveros's contention fails because the unequivocal waiver of counsel at an earlier hearing cannot be made equivocal by subsequent events. *Cf. United States v. Willie*, 941 F.2d 1384, 1391 (10th Cir. 1991) ("Since [the defendant] has waived his right to counsel, he cannot now assert that the trial court erred in not replacing the attorney whose assistance he has waived.").

decision to exercise his *Faretta* right and represent himself at trial is a choice cast in stone."). Instead, in evaluating post-waiver requests for reappointment of counsel, we examine "the degree to which a defendant has shown good cause and the timeliness of the request." *Merchant*, 992 F.2d at 1095.

Before addressing the good cause and timeliness of his request for reappointment of counsel, Ontiveros argues that the district court committed reversible error by neglecting to make formal factual findings in support of its denial of the post-waiver request. Ontiveros cites no Tenth Circuit authority requiring formulaic fact-finding in this context. Regardless, we believe the district court made adequate inquiries in this case. *See United States v. Leveto*, 540 F.3d 200, 208 (3d Cir. 2008) ("[W]e do not insist upon a formal inquiry or colloquy where the rationales for the request and decision are clearly apparent on the record."). Before denying the request for appointment of a third lawyer, the court called Ontiveros's supposedly retained attorney, discussed Ontiveros's desire to fire Reisch even as advisory counsel, inquired into the harm that delay would cause the prosecution, and examined Ontiveros about his failure to prepare for the suppression hearing. In this case, the district court's inquiries were more than enough.

If Ontiveros actually argues now that he would have accepted reappointment of Reisch as counsel, he must admit that he did not ask the district court to reappoint him. The court would have had no reason to believe Ontiveros desired that. The district court plainly knew about Ontiveros's displeasure with Reisch's

representation. Just before requesting another round of appointed counsel, Ontiveros had expressed his desire to fire Reisch. When Ontiveros really did seek Reisch's reappointment (after losing the suppression motion), the district court immediately appointed Reisch again.

Next, Ontiveros contends his post-waiver request for counsel was timely and supported by good cause. We disagree. As to good cause, the record reflects that Ontiveros requested new counsel, in part, because he was supposedly unprepared. The district court had already continued the suppression hearing by nearly three weeks to ensure that Ontiveros would have sufficient time to prepare. After getting that continuance, Ontiveros assured the court that he would be ready and prepared for the hearing. Nonetheless, Ontiveros waited until the start of the suppression hearing to request a third appointed lawyer. Ontiveros's lack of preparation does not present a good cause to grant a post-waiver request for reappoint of counsel.

Additionally, Ontiveros's request for a third round of appointed counsel was untimely. For no good reason, Ontiveros waited until the day of the suppression hearing to tell the court about his supposedly retained counsel and, after that was proved false, to request yet another court-appointed attorney. Even if we accepted that "retained counsel" had visited Ontiveros three days before the suppression hearing and agreed to represent him, Ontiveros still could have advised the court of this at that time rather than on the morning of the suppression hearing.

Not only did Ontiveros sit on his request, but granting it would have strained the court's schedule and wasted the time of seven law enforcement officers present and ready to testify.

> A criminal defendant has a constitutional right to defend himself; and with rights come responsibilities. If at the last minute he gets cold feet and wants a lawyer to defend him he runs the risk that the judge will hold him to his original decision in order to avoid the disruption of the court's schedule that a continuance granted on the very day that trial is scheduled to begin is bound to cause.

*United States v. Solina*, 733 F.2d 1208, 1211–12 (7th Cir. 1984). Accordingly, the court acted within its discretion to deny Ontiveros's post-waiver motion for another appointed counsel. *See Reddeck*, 22 F.3d at 1510 ("We have repeatedly shown concern with the use of the right to waive counsel as a cat and mouse game with the courts." (internal quotations omitted)).

In arguing otherwise, Ontiveros relies heavily upon *United States v. Proctor*, 166 F.3d 396 (1st Cir. 1999). In *Proctor*, as here, the district court had denied at a motions hearing the defendant's post-waiver request for counsel. *Id.* at 400. In denying the post-waiver request, the court stated, "Well, it's too late for that." *Id.* at 400. The defendant represented himself at trial and was found guilty. *Id.* He requested and received counsel for sentencing. *Id.* The First Circuit overturned the post-waiver denial because the district court had failed to articulate whether its statement that it was too late for appointment of counsel applied only to the motion hearing that day or instead to the rest of the criminal proceedings. *Id.* at 405–06. In examining the district court's denial, the First Circuit remarked that if "Proctor only

- 18 -

sought and was denied counsel for the rest of the day, we would have no difficulty in rejecting his Sixth Amendment claim." *Id.* at 403.

The instant case differs from *Proctor* because here the district court did not deny appointed counsel for the rest of the case—only for what was originally set as a one-day suppression hearing. Nothing suggests that the district court would have refused to appoint Reisch as counsel at any point in the proceeding. In fact, the district court tried to persuade Ontiveros to keep Reisch as counsel rather than represent himself. When Ontiveros asked that the court reappoint Reisch at the end of the suppression hearing, it immediately did so. Accordingly, unlike the defendant in *Proctor*, Ontiveros did not suffer from any ambiguity on the part of the district court, and he was not denied counsel for the remaining proceedings.[3]

We note that even if the Sixth Amendment did guarantee Ontiveros a third appointment of counsel, he still would have no right to appointed counsel *of choice*. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). We must remember that the district court found no irreconcilable difference between Reisch and Ontiveros. "[T]he Supreme Court has stated that those without the means to hire counsel have no cognizable complaint in the face of adequate court-appointed representation . . . ." *United States v. Flanders*, 491 F.3d 1197, 1216 (10th Cir. 2007) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)). Thus, Ontiveros

---

[3] Because we find the trial court did not err in denying Ontiveros's post-waiver request, we need not reach the harmless error arguments.

- 19 -

had no right for the court to appoint him a third attorney—Reisch remained a sufficient court-appointed counsel. In light of the circumstances, we find that the district court did not abuse its discretion by denying appointed counsel on the morning of the suppression hearing.

## B. Probable Cause for the Warrant

"In reviewing the denial of a motion to suppress, we must view the evidence in the light most favorable to the government and uphold the district court's factual findings unless clearly erroneous." *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009). We review de novo Fourth Amendment legal determinations—e.g. probable cause and the good-faith exception. *Id.* Searches conducted under a warrant receive greater deference: "[W]e look to ensure that the judge had a substantial basis for concluding that the affidavit in support of the warrant established probable cause." *United States v. Burkhart*, 602 F.3d 1202, 1205 (10th Cir. 2010) (internal quotations omitted).

Under the Fourth Amendment, no warrant shall issue "but upon probable cause." U.S. Const. amend. IV. "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Barajas*, 710 F.3d 1102, 1108 (10th Cir. 2013) (internal quotations omitted). The affidavit must create a nexus between the particular place to be searched and the suspected criminal activity. *Id.* Ultimately, an affiant must present adequate

information to the magistrate by which the magistrate can find probable cause. *Id.* The magistrate must not ratify the bare conclusions of others or reach a decision by "piling hunch upon hunch." *Roach*, 582 F.3d at 1200.

Ontiveros argues that the search warrant lacked a nexus between the garage and the suspected criminal activity—explosive devices, firearms, and drugs. This argument fails. First, a trash sweep conducted the same day the search warrant issued yielded a suspected explosive device, two handgun holsters (Ontiveros was a felon and prohibited from possessing firearms), and notes about drug sales. Although not definitive evidence of gun possession, the presence of holsters made it more likely that firearms might be in the garage. Further, the presence of a note and ledger likely pertaining to drug sales made it more likely that Ontiveros was indeed possessing and selling controlled substances from his garage. Finally, the condition and testing of the suspected explosive device made it more likely that Ontiveros was possessing or manufacturing these devices somewhere on the property covered by the search warrant.

Next, Ontiveros argues that the suspected explosive device cannot establish probable cause because the affidavit presents a materially misleading description and relies on the bomb squad commander's conclusory statements. Both contentions fail. The affidavit stated that "the device had a bamboo body with an inner cardboard body" and "a green fuse and the contents inside burned rapidly during a burn test." R. vol. 1, at 96. Based upon these facts, the commander of the bomb squad said the

device met the statutory definition of an explosive device. Nothing in this description suggests a materially misleading characterization. The bomb squad commander based his conclusion on a straight-forward factual description of the suspected device. *Cf. Ornelas v. United States*, 517 U.S. 690, 700 (1996) ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists.").

When we combine the items recovered in the trash sweep with the other investigative information contained in the affidavit, we see a nexus between Ontiveros, his garage, and the suspected criminal activity. We believe that the state magistrate had a substantial basis to find that the affidavit supplied probable cause of each of the identified suspected crimes.

Ontiveros argues that the information provided by unnamed persons cannot be considered at all because the individuals lack credibility.

> When judging information provided by an informant as the foundation supporting probable cause for a search warrant, we consider the informant's veracity, reliability, and the basis of knowledge as relevant factors to evaluate in assessing whether given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004) (internal quotations and alterations omitted). Nothing in the record, aside from Ontiveros's allegations, suggests that the individuals lacked veracity, reliability, or a basis of knowledge. Although some of the persons were unnamed in the affidavit, their identities were known to the police but omitted because they feared retaliation from Ontiveros. The affiant also took independent action to verify and corroborate the individuals'

- 22 -

statements. *See United States v. Jenkins*, 313 F.3d 549, 556 (10th 2002) (upholding probable cause based upon an affidavit containing anonymous tips based, in part, upon the police independently corroborating the informant's allegations). When we consider the information provided by the individuals along with the fruits of the trash sweep, the allegations bear sufficient reliability to support probable cause. *See id.* at 554 ("[T]he informant's allegations . . . bore sufficient indicia of reliability such that, when considered with the other information supplied by the officer, the affidavit was sufficient to permit a finding of probable cause.").

Further, the affidavit identifies Ontiveros's past convictions and arrests for crimes such as "Possession of Weapons by Previous Offenders" and "Possession of Dangerous Drugs" among others.[4] R. vol. 1, at 95. "[C]riminal history, combined with other factors, can support a finding of reasonable suspicion or probable cause." *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004). When the previous felony convictions and drug-related criminal history are considered in light of the potential evidence concerning firearm possession and the drug sales, it becomes more probable that Ontiveros was engaged in criminal activity. *See Artez*, 389 F.3d at 1115

---

[4] Ontiveros contends that many of these incidents fail to support probable cause because they deal with undated arrests and irrelevant convictions. We review probable cause under the totality of the circumstances. The circumstances here suggest Ontiveros's ongoing criminal activity with guns and drugs, corroborated by the trash sweep and information provided by witnesses and individuals, made the suspected criminal activities more likely.

(finding a substantial basis for probable cause in an affidavit based, in part, upon the defendant's and his accomplices' drug related criminal histories).

Even so, Ontiveros argues that both his criminal history and the information provided by the individuals were stale. We cannot uphold probable cause based upon stale information. *Roach*, 582 F.3d at 1201. In determining the staleness of information, we consider "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Id.* (internal quotations omitted). When the evidence suggests "a longstanding pattern of repeated activity," staleness becomes less important because "it [is] less likely that the activity has ceased within a short time frame." *Id.* With ongoing and continuous criminal activity, recent information may revive and refresh stale information. *United States v. Cantu*, 405 F.3d 1173, 1177–78 (10th Cir. 2005).

Although not raised by the government on appeal, we believe that Ontiveros waived any challenge to the staleness of the affidavit's information since he neither raised the argument below nor showed good cause for his failure to do so. *United States v. Burke*, 633 F.3d 984, 991 (10th Cir. 2011) ("[W]e hold [Fed. R. Crim. P.] 12's waiver provision . . . governs motions to suppress evidence, including specific arguments to suppress evidence, raised for the first time on appeal. Such motions and arguments are waived absent a showing of good cause for why they were not raised below."). Therefore, we need not reach the staleness challenges.

Regardless, even if we entertained the argument, the court properly considered both the investigative information and the criminal history because they demonstrated a pattern of ongoing criminal activity. The affidavit tracks Ontiveros's alleged activity: first, in 2009, claims that Ontiveros had sold stolen property from his garage; second, in 2010, a witness linked Ontiveros to recovering stolen property at gun point while using methamphetamine; third, in late 2010, allegations of methamphetamine sales and firearm possession; fourth, in early 2011, a traffic stop which revealed suspected methamphetamine and ammunition; and fifth, immediately before the instant search, a trash sweep with evidence supporting the earlier accounts of firearms and drugs at Ontiveros's garage. Accordingly, even if some of the information was dated, the clear pattern of ongoing and continuous criminal activity allowed the state magistrate to consider the investigative information and Ontiveros's criminal history. *Cantu*, 405 F.3d at 1177–78.

Ultimately, we determine probable cause by a totality of the circumstances. *Barajas*, 710 F.3d at 1108. We are not free to "divide-and-conquer" individual facts within the affidavit that alone may not support probable cause. *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004). Nothing Ontiveros presents shakes our confidence that the totality of the circumstances reveals a fair probability that Ontiveros was committing the alleged criminal activity at his garage. Therefore, the district court did not err in finding that the state magistrate had a substantial basis to find probable cause supporting the search warrant.

Because we uphold the probable cause determination, we need not reach the district court's good-faith exception analysis. *Mathis*, 357 F.3d at 1207. But even if we believed that the search warrant was not based on probable cause, we still would sustain the search warrant on grounds of the good-faith exception. Evidence obtained under a search warrant later found to be unsupported by probable cause "need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). The good-faith exception does not apply in four situations:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth. Second, the exception does not apply when the issuing magistrate wholly abandons her judicial role. Third, the good-faith exception does not apply when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

*Id.* at 1007 (internal citations, quotations, and alterations omitted).

Ontiveros claims that the warrant in this case falls under the first and third situations, but we disagree. Even though the affidavit incorrectly claimed the drug ledger tracked sales *since* March 2011, rather than *as of* March 2011, the affidavit quoted the full ledger accurately right above the mistake. Accordingly, the mistake obviously was inadvertent and the state magistrate would not have been misled. Additionally, our earlier finding that probable cause supported the warrant defeats

- 26 -

any suggestion that it so lacked probable cause that the state magistrate's reliance upon it was unreasonable.

Accordingly, even if there had not been a substantial basis for probable cause, which we find there was, the *Leon* good-faith exception would have defeated the suppression motion.

### C. Substantive Reasonableness of Ontiveros's Sentence

We review sentencing decisions for substantive reasonableness under the abuse of discretion standard. *United States v. Martinez,* 610 F.3d 1216, 1227 (10th Cir. 2010). We afford the district court substantial deference in determining the reasonableness of the sentence considering the requisite 18 U.S.C. § 3553(a) factors. *Id.* Ultimately, we only reverse a sentence if the district court "renders a judgment that is arbitrary, capricious, whimsical or manifestly unreasonable." *Id.* (internal quotations omitted).

Ontiveros challenges the substantive reasonableness of his sentence. *See Martinez*, 610 F.3d at 1223 ("Reasonableness review has a procedural and substantive component."). He argues the district court unreasonably relied upon his past criminal history, neglecting the other 18 U.S.C. § 3553(a) factors, in sentencing him to the minimum of his advisory guideline range and denying a downward variance. Ontiveros's argument fails for two reasons.

First, on appeal, we presume the reasonableness of a sentence within the advisory guideline range. *United States v. Alvarez-Bernabe*, 626 F.3d 1161, 1167

(10th Cir. 2010). Ontiveros was sentenced to imprisonment for 262 months, the low end of his advisory guideline. He has failed to raise any argument effectively undermining the presumed reasonableness of this within-guidelines sentence.

Second, the district court considered the relevant factors and did not place undue weight on Ontiveros's criminal history. The court certainly considered "the nature and circumstances of the offense." § 3553(a)(1). The court addressed the need for Ontiveros's sentence "to reflect [the] seriousness of the offense." § 3553(a)(2)(A). The court then addressed how the sentence would "protect the public from further crimes." § 3553(a)(2)(C). Finally, the court addressed the "kinds of sentence and the sentencing range" applicable under § 3553(a)(4). The court's thorough and balanced consideration of the relevant § 3553(a) factors satisfies us of the substantive reasonableness of the sentence. *See United States v. Cordova*, 461 F.3d 1184, 1189 (2006) ("The sentencing court . . . is not required to consider individually each factor listed in § 3553(a) . . . ." (internal quotations omitted)). Thus, the district court did not abuse its discretion.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's decision to allow Ontiveros to proceed pro se and to deny his post-waiver reappointment of counsel.

- 28 -

We AFFIRM the court's denial of the motion to suppress. Finally, we AFFIRM the reasonableness of Ontiveros's sentence.

Entered for the Court


Gregory A. Phillips
Circuit Judge